# EXHIBIT A

| STATE OF TENNESSEE 16th JUDICIAL DISTRICT CIRCUIT COURT | SUMMONS | CASE FILE NUMBER 105451 |
|---|---|---|

| PLAINTIFF KEVEN McCORD TRACY McCORD | DEFENDANT GOLDMAN SACHS MORTGAGE CORP. ET AL vs. |
|---|---|

**TO: (NAME & ADDRESS OF DEFENDANT)**

MTGLQ INVESTORS LP
PARTNER OR MANAGING AGENT
200 WEST ST.
NY NY 10282

List each defendant on a separate summons.

YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU ARE DIRECTED TO FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGE-MENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff: (Name, address & telephone number) CAROL A. MOLLOY ESQ 6724 BUFORD STA. RD. LYNNVILLE TN 38472 (931) 527-3603 | DATE ISSUED & ATTESTED October 17 2012 LAURA BOHLING, Circuit Court Clerk BY: L. Stem                Deputy Clerk |
|---|---|

**CERTIFICATION**

I, LAURA BOHLING, Clerk of the Circuit Court of Rutherford County, Tennessee, do certify this to be a true and correct copy of the origianl summons issued in this cause.

BY: L. Stem                                      DEPUTY CLERK

| TO THE SHERIFF: Please execute this summons and make your return within thirty days of issuance as provided by law. | DATE RECEIVED Sheriff |
|---|---|

**RETURN ON PERSONAL SERVICE OF SUMMONS**

I hereby certify and return that I served this summons together with the complaint as follows:

| DATE OF PERSONAL SERVICE: | |
|---|---|
| | Sheriff BY: |

Submit three copies: service copy, defendant's copy, file copy.

CIRCUIT COURT FOR RUTHERFORD COUNTY
STATE OF TENNESSEE

| | |
|---|---|
| **KEVEN MCCORD and**<br>**TRACY MCCORD,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) 6 5 4 5 1 |
| v. | ) |
| | ) DOCKET NO. |
| **GOLDMAN SACHS MORTGAGE CORPORATION;** | ) JURY TRIAL |
| **MTGLQ INVESTORS, L.P.; OCWEN LOAN** | ) DEMANDED |
| **SERVICING, LLC; WILSON & ASSOCIATES;** | ) |
| **DOES 1-10** | ) |

---

## COMPLAINT

Plaintiffs, Keven McCord and Tracy McCord ("Plaintiffs"), for their Verified

Complaint against Goldman Sachs Mortgage Corporation ("Goldman"); MTGLQ

Investors, L.P. ("MTGLQ"); Ocwen Loan Servicing, LLC ("Ocwen") and Wilson &

Associates ("Wilson") state as follows:

Defendants, Goldman and Wilson foreclosed upon Plaintiffs' right of redemption

for property located at 3414 Westbrook Drive, Murfreesboro, TN 37130 (the subject

"Property") on September 7, 2012. Defendants did not have any right, title and/or

interest in Plaintiffs' property and therefore were not entitled to foreclosure Plaintiffs'

right of redemption through non-judicial foreclosure or otherwise.

### PARTIES

1.      Plaintiffs currently reside at 3414 Westbrook Drive, Murfreesboro, TN 37130

("Subject Property") as their primary residence, which was foreclosed upon on

September 7, 2012 by Defendants Goldman and their agents Ocwen and Wilson despite

the following:

1

a)      The foreclosing entity did not have a security interest in Plaintiffs' property since the Deed of Trusts, both first and second, were dated prior to Plaintiffs obtaining title to the property;

b)      Plaintiffs deny that they ever had any completed financial transaction with the foreclosing entities or any predecessors thereof in which the Defendants neither funded nor purchased Plaintiffs' loan from any bona fide creditor;

c)      Plaintiffs did not receive notice of the foreclosure prior to Defendants foreclosing upon their right of redemption;

d)      The foreclosure was in violation of law in that there was no default;

e)      The foreclosing entity did not have a security interest in the Note;

f)      The Trustee failed to comply with T.C.A. 47-13-101.

2.      The Defendant Goldman is a New York limited partnership with its principal place of business located at 200 West Street, NY, NY 10282. Goldman Sachs Mortgage Company is an affiliate of Goldman Sachs & Company.

3.      The Defendant MTGLQ is a limited partnership of unknown capacity directly and wholly owned by Goldman Sachs Bank and doing business in the State of Tennessee and upon information and belief claims to be an assignee of Washington Mutual Bank, successor in interest to Long Beach Mortgage Company along with their claim that they are the assignor of Plaintiffs' loan assigning their alleged interest to Goldman Sachs Mortgage Company. MTGLQ has a principal place of business located at 200 West Street, NY, NY 10282.

4.      Ocwen is a subsidiary of Ocwen Financial Corporation, is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors,

2

including pooled mortgage-backed securities. Defendant Ocwen maintains its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409.

5.     Defendant Wilson is a law firm formed as a PLLC under the laws of the State of Arkansas. Service of Process can be made upon their registered agent, CT Corporation Systems, 800 S. Gay Street, Ste. 2021, Knoxville, TN 37929.

Defendant Wilson is, among other things, engaged in the business of collecting debts owed to others incurred for personal, family and/or household purposes. Defendant is a "debt collector" as defined in the first sentence of 15 U.S.C. § 1692a(6) in that it is an entity that "regularly collects or attempts to collect, directly or indirectly, debts owed or due to be asserted to be owed or due another."

Upon information and belief and therefore alleged, even when engaging in judicial or non-judicial foreclosure activities, Wilson goes beyond the enforcement of a security interest in that it seeks more than security enforcement by seeking full payoff of the amount due or reinstatement payments or by threatening or filing deficiency judgments on amounts due.

6.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1-10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when this knowledge is obtained.

## STATEMENT OF FACTS

7.     On August 24, 2005, Plaintiffs signed a note in the amount of $143,792.00 naming Long Beach Mortgage Company as the Lender.

3

8.      The note signed by the Plaintiffs does not constitute a valid contract between the Plaintiffs and the alleged "Lender" because the offer made by the Defendants to Plaintiffs pursuant to the Note was not the actual transaction contemplated and ultimately consummated by the Plaintiffs and Defendants.

9.      On information and belief and therefore alleged, this money to fund Plaintiffs loan was obtained from some unknown source prior to Plaintiffs applying for a loan which is known as "selling forward."

10.     On information and belief and therefore alleged, although Plaintiffs allege that their loan was sold into a securitized trust the money to fund their loan did not come from the trust. In order to ascertain who is the true lender of Plaintiffs loan the trust must be identified by the Defendants and a full accounting of the "res" of the trust both from the creditor and borrower side of the equation.

11.     The terms presented to the Plaintiffs pursuant to the Note, and which the Plaintiffs thought they were accepting, were not the true terms of the transaction into which the Plaintiffs entered.

12.     On information and belief and therefore alleged, the unidentified trust was never actually funded with either cash from the investors or loans from borrowers such as Plaintiffs.

13.     There was no "meeting of the minds" regarding the note signed by Plaintiffs because of the lack of knowledge by the Plaintiffs of the identity of the true lender and that Defendants intended to securitize their loan.

14.     The consideration which was described on the Note and which the Defendants led the Plaintiffs to believe was the actual consideration for the alleged contract differed

4

significantly from the consideration stated in the Note in that Long Beach Mortgage Company was not the true Lender.

15.     On information and belief and therefore alleged, Long Beach was a thinly capitalized "sham" company to act as originator. The note to them by Plaintiffs was no more a note to the actual party that funded the loan than was the deed of trust a pledge to the actual party of property.

16.     On information and belief and therefore alleged, Long Beach did not fund Plaintiffs' loan. Long Beach was merely an originator who was paid to act as though they were the lender to (a) induce the borrower to sign a note and deed of trust and (b) induce insurance companies and other co-obligors that the "originator was the lender when I fact there had been no financial transaction (money changing hands) unbeknownst to the Plaintiffs or the investor lenders.

17.     The terms of the mortgage bond sold to investors which was never signed nor disclosed to the Plaintiffs differed from the terms on the Note signed by the Plaintiffs. The Plaintiffs didn't know anything about the terms of the bonds and the investors didn't know the terms of the Plaintiffs' Note a fact that the "intermediaries" like to keep hidden from both the Plaintiffs and the investors.

18.     Long Beach did not fund the loan and the actual lender, whose identity is still unknown to Plaintiffs, were presented with an entirely different set of terms of repayment than that presented to Plaintiffs at closing. Plaintiffs, who are not a party to the Pooling and Servicing Agreement governing the Trust into which Plaintiffs' loan was allegedly transferred, do not know the terms of the Pooling and Servicing Agreement along with

5

any restrictions of the Agreement pertaining to modifications and ultimately what restrictions are placed on any workout options available to the Plaintiffs.

19. Due to the lack of knowledge, consideration and consequences of such restrictions there was not "meeting of the minds" on the part of the Plaintiffs when they signed the closing documents.

20. Plaintiffs' Note allegedly gives the Lender the right to sell the Note but no where in the Note do the Plaintiffs authorize the Lender to securitize their loan and hide the true identity of their Lender.

21. Long Beach, and its successors and/or assigns, was not Plaintiffs' lender and Plaintiffs state that they are not liable on any debt to Long Beach or its successors and/or assigns. Long Beach, its successors and/or assigns, is not now nor can it ever be, in the position where it could accept a payoff and issue a satisfaction of mortgage and return the note as paid.

22. Plaintiffs' signatures, on the Note described in paragraph 7 above, were procured by fraud.

23. The Note, upon which Plaintiffs' signature appears, does not constitute a valid contract and therefore there can be no default as to Long Beach or its successors and/or assigns.

24. Plaintiffs deny that they are in default to any of the Defendants pursuant to the note described in paragraph 7 above.

25. The appearance of Plaintiffs' agreement to the terms of the Note, described in paragraph 7 above, was based upon an executory promise of funding by the payee on the

6

Note, the lender described in the deed of trust and the disclosures in the settlement documents.

26.     On August 24, 2005, Plaintiffs signed a note in the amount of $35,948.00 naming Long Beach Mortgage Company as the Lender.

27.     The note signed by the Plaintiffs does not constitute a valid contract between the Plaintiffs and the alleged "Lender" because the offer made by the Defendants to Plaintiffs pursuant to the Note was not the actual transaction contemplated and ultimately consummated by the Defendants.

28.     The terms presented to the Plaintiffs pursuant to the Note, and which the Plaintiffs thought they were accepting, were not the true terms of the transaction into which the Plaintiffs entered.

29.     There was no "meeting of the minds" regarding the note signed by Plaintiffs because of the lack of knowledge by the Plaintiffs of the identity of the true lender and that Defendants intended to sell their loan into a securitized trust.

30.     The consideration which was described on the Note and which the Defendants lead the Plaintiffs to believe was the actual consideration for the alleged contract differed significantly from the consideration stated in the Note in that Long Beach Mortgage Company was not the true Lender.

31.     Long Beach did not fund the loan and the actual lender, whose identity is still unknown to Plaintiffs, were presented with an entirely different set of terms of repayment than that presented to Plaintiffs at closing.

32.     Plaintiffs, who are not a party to the Pooling and Servicing Agreement governing the Trust into which Plaintiffs' loan was allegedly transferred, do not know the

7

terms of the Pooling and Servicing Agreement along with any restrictions of the Agreement pertaining to modifications and ultimately what restrictions are placed on any workout options available to the Plaintiffs.

33.     Due to the lack of knowledge, consideration and consequences of such restrictions there was not "meeting of the minds" on the part of the Plaintiffs when they signed the closing documents.

34.     Plaintiffs allege that the appraisal of their property was intentionally inflated.

35.     Had Plaintiffs known that the appraisal was intentionally inflated they would never had participated in the Loan and therefore there was no "meeting of the minds" on the part of the Plaintiffs when they signed the closing documents.

36.     The payee/lender described in the note and deed of trust were mere naked nominees for a table funded loan, expressly described as illegal and predatory lending in TILA and Regulation Z of the Real Estate Settlement Procedures Act.

37.     Plaintiffs' Note allegedly give the Lender the right to sell the Note but no where in the Note do the Plaintiffs authorize the Lender to securitized their loan and hide the true identity of their Lender.

38.     Plaintiffs' signatures, on the Notes described in paragraphs 7and 9 above, were procured by fraud.

39.     The Note, upon which Plaintiffs' signatures appear, does not constitute a valid contract and therefore there can be no default.

40.     Plaintiffs deny that they are in default to any of the Defendants pursuant to the note described in paragraph 9 above.

8

41.     The appearance of Plaintiffs' agreement to the terms of the Note, described in paragraph 9 above, was based upon an executory promise of funding by the payee on the Note, the lender described in the deed of trust and the disclosures in the settlement documents.

42.     The payee/lender described in the note and deed of trust were mere naked nominees for a table funded loan, expressly described as illegal and predatory lending in TILA and Regulation Z of the Real Estate Settlement Procedures Act.

43.     On August 24, 2005, Plaintiffs signed a Deed of Trust naming Long Beach Mortgage Company as the beneficiary under the Deed of Trust allegedly securing the $143,792.00 note to Long Beach Mortgage Company with Plaintiffs' Property.**(Ex. 1).**

44.     The Lender named on the Deed of Trust, Long Beach, its successors and/or assigns, is not the true beneficiary but rather a stand-in for undisclosed principals for a table-funded loan in violation of the Truth-in-Lending Act.

45.     On information and belief and therefore alleged, Plaintiffs' entire set of "closing" papers were split from the actual financial transaction.

46.     The Deed of Trust is not a valid lien on Plaintiffs' Property. Said Deed of Trust was recorded with the Rutherford County Registry of Deeds in Book 553, Page 1194. Wesley D. Turner was the named Trustee on said Deed of Trust.

47.     On August 24, 2005, Plaintiffs signed a Deed of Trust naming Long Beach Mortgage Company as the beneficiary under the Deed of Trust allegedly securing the $35,948.00 note to Long Beach Mortgage Company with Plaintiffs' Property.**(Ex.2).**

48.     The Deed of Trust is not a valid lien on Plaintiffs' Property because the Note that it allegedly secures does not constitute a valid contract between the Plaintiffs and

9

Long Beach. Said Deed of Trust was recorded with the Rutherford County Registry of Deeds in Book 553, Page 1205. Wesley D. Turner was the named Trustee on said Deed of Trust.

49.     The same scenario described above as to Plaintiffs' Deed of Trust in the amount of $143,792.00 applies to the Deed of Trust in the amount of $35,948.00.

50.     On information and belief and therefore alleged, Plaintiffs' Notes described above were invalid and any transfer of the Notes was a nullity. The form of the transfer of the Notes by the "originators" (Long Beach) and intermediaries (MTGLQ, Goldman and Ocwen) was the opposite of that intended by the Pooling and Servicing Agreement for the unidentified trust so that they could "borrow" the loan to trade on it, get insurance payable to the intermediaries.

51.     The form of transfer of the Notes by the "originators" and intermediaries was the opposite of that intended by the Pooling and Servicing Agreement for the unidentified trust so that they could take ownership of the loan along with the proceeds from the hedge products specifically described in the Pooling and Servicing Agreement and used to pay the "originator" and intermediaries instead of the actual creditor.

52.     The net result of the actuality of these papers (closing documents) and the document "trail" was to hide the fact that the intermediaries received money on behalf of the real creditor in the form of Plaintiffs' monthly mortgage payment which payment was never used to decrease the obligation to the real creditor but was instead retained by the intermediary banks as profits.

53.     On information and belief and therefore alleged, by the intermediaries maintaining the balance with the actual creditors as though no mitigation payments had

10

been received, they interfered with the Plaintiffs' account statement. Neither the Plaintiff nor the actual lender knew of the money that had been diverted and retained by the intermediary banks. Therefore, the receivable generated by the ersatz mortgage bond and the receivable generated by the ersatz promissory note was never reduced in accordance with generally accepted accounting principals.

54. On August 25, 2012 Plaintiffs were granted title to the subject Property by Special Warranty Deed which deed was recorded with the Rutherford County Registry of Deeds in Book 553, Page 1192. **(Ex. 3).**

55. Plaintiffs' Deeds of Trust predated their ownership in the property and therefore the Deeds of Trust do not create a valid lien upon Plaintiffs' Property. Plaintiffs' notes are unsecured and therefore the foreclosure is/was wrongful.

56. On September 12, 2005 Long Beach Mortgage Company assigned their alleged interest under the Deed of Trust recorded with the Rutherford County Registry of Deeds in Book 553, Page 1205 to Goldman Sachs Mortgage Company by document dated September 12, 2005 and recorded on August 23, 2010 with said Deeds in Book 1009, Page 3825. Said assignment is attempting to assign a void deed of trust and therefore the assignment does not convey any right, title and/or interest to Goldman Sachs Mortgage Company. **(Ex.4).**

57. On September 22, 2008 Washington Mutual Bank, successor in interest to Long Beach Mortgage Company assigned their alleged interest under the Deed of Trust recorded with the Rutherford County Registry of Deeds in Book 553, Page 1194 to MTGLQ Investors, L.P. by document recorded on November 18, 2008 with said Deeds in Book 881, Page 1091. Said assignment is attempting to assign a void deed of trust and

11

therefore the assignment does not convey any right, title and/or interest to MTGLQ Investors, L.P. **(Ex.5).**

58.        On May 21, 2012 MTGLQ assigned their alleged interest under the Deed of Trust recorded with the Rutherford County Registry of Deeds in Book 553, Page 1194 to Goldman Sachs Mortgage Company by document recorded on July 23, 2012 with said Deeds in Book 1145, page 3592.  Said assignment is attempting to assign a void deed of trust and therefore the assignment does not convey any right, title and/or interest to Goldman Sachs Mortgage Company. **(Ex.6).**

59.        The assigning of the loan to Goldman Sachs on May 21, 2012, was done to give the appearance that Goldman Sachs became the assignee of a valid deed of trust.  If Goldman Sachs had actually had to pay money in order to obtain an assignment of the Deed of Trust they wouldn't have purchased Plaintiffs' loan at a time when, according to them, the loan was allegedly in default and in imminent danger of being foreclosed upon. The assignment of the Deed of Trust was to give the appearance of a true sale of the loan. The money trail was not congruent with the documents signed by Plaintiffs.

60.        On June 29, 2006 Cassie Inouye, V.P. of Long Beach Mortgage Company allegedly signed a Substitute of Trustee attempting to substitute the Trustee for Deed of Trust recorded with the Rutherford County Registry of Deeds in Book 553, Page 1194. The aforementioned Substitute of Trustee was notarized by Angelica Lopez on July 6, 2006, one week after Cassie Inouye signed the document.  Said document was recorded with the Rutherford County Registry of Deeds in Book 648, Page 3177. **(Ex. 7).**

61.        The signature of Cassie Inouye is an ink stamped signature with a "squiggle" next to it.  Given the document was allegedly signed on June 29, 2006 and notarized on

12

July 6, 2006 and the signature is merely a stamped signature, Plaintiffs allege that Cassie Inouye did not sign the document in the presence of the notary public Angelica Lopez and is therefore void.

62.     The Substitution of Trustee attempted to appoint Priority Trustee Services of TN, L.L.C. as Substitute Trustee.

63.     Long Beach, on June 29, 2006, pursuant to the aforementioned document, "declares" itself to be "holder of the Promissory Note" and further states in said document that the "Deed of Trust expressly provides that the holder of the Promissory Note is empowered to replace the Trustee therein named and appoint a successor trustee…"

64.     Paragraph 23 of the Deed of Trust states: "Substitute Trustee. **LENDER,** at its option, may from time to time remove Trustee and appoint a successor trustee…" (emphasis added). Long Beach, as alleged "holder" of the note is not empowered to appoint a substitute trustee and therefore the appointment of Priority Trustee Services of TN, L.L.C. is void.

65.     The Substitution of Trustee is void and of no force and effect and therefore Priority Trustee Services of TN, L.L.C. was never properly appointed Substitute Trustee.

66.     On June 14, 2012 Richard Work, Contract Management Coordinator for Ocwen Loan Servicing, LLC allegedly signed a Substitution of Trustee which was allegedly notarized by Cory Messer and recorded with the Rutherford County Registry of Deeds in Book 1139, Page 3747. **(Ex.8).**

67.     The signature of Richard Work is an ink stamped signature with a very similar "squiggle" contained in the appointment of substitute trustee described in paragraph 19

13

herein. Plaintiffs allege that Richard Work did not sign the document in the presence of the notary public Cory Messer.

68.    Wilson & Associates prepared and caused to be executed the aforementioned "Appointment of Successor Trustee" allegedly appointing Wilson & Associates as Successor Trustee.

69.    Ocwen Loan Servicing, LLC, claims its authority to appoint a successor trustee is derived from the "terms and conditions of said Deed of Trust."

70.    Paragraph 23 of the Deed of Trust states: "Substitute Trustee. **LENDER,** at its option, may from time to time remove Trustee and appoint a successor trustee…" (emphasis added).

71.    Ocwen, as alleged "holder of said Deed of Trust, or acting with the authority of the holder of said Deed of Trust" is not the Lender and has no authority to appoint a Substitute or Successor Trustee and therefore the appointment of Wilson & Associates as Successor Trustee is void.

72.    Wilson & Associates was never properly appointed Successor Trustee or otherwise and any actions, taken by Wilson in connection with collection of money due under the note or foreclosure of Plaintiffs' right of redemption under the Deed of Trust, were taken without authority rendering the foreclosure void.

73.    The reason there are so many inconsistencies, mistakes and fraudulent actions pertaining not only to Plaintiffs' loan but to many loans around the country is because the "originator" and the intermediary banks never put up any of their own money. The "originator" never funded the loan. The assignees never paid anything to "purchase" the

14

loan and the foreclosing entity, Goldman, placed a credit bid and therefore never paid anything either up front as a lender or upon its purchase at foreclosure.

74. On or about August 2006 Plaintiffs filed for Chapter 13 Bankruptcy Protection with the U.S. Bankruptcy Court for the Middle District of Tennessee.

75. Pursuant to the documents drafted and recorded with the Rutherford County Registry of Deeds whereby Long Beach allegedly assigned their interest to Goldman Sachs on September 12, 2005, Goldman did not claim to be a secured creditor in Plaintiffs' Chapter 13 Bankruptcy which was filed in August 2006.

76. Washington Mutual ("WAMU") did not become the successor-in-interest to Long Beach until 2007 however, WAMU, in 2006, filed a proof of claim in Plaintiffs' Chapter 13 Bankruptcy as a first lien holder on Plaintiffs' property. WAMU was not a servicer or creditor, secured or otherwise, of Plaintiffs at the time they filed their Proof of Claim in Plaintiffs' Chapter 13 bankruptcy.

77. On information and belief and therefore alleged, Ocwen was not the servicer or creditor, secured or otherwise, of Plaintiffs at the time they filed their Proof of claim in Plaintiffs' Chapter 13 bankruptcy

78. The entities who filed proof of claims and who received payment through Plaintiffs' Chapter 13 Bankruptcy were not the actual creditors who funded Plaintiffs' loan whose identity is still unknown.

79. There is no proof that any of the money paid to the Defendants who claimed to be secured creditors in Plaintiffs' Chapter 13 Bankruptcy was ever sent to Plaintiffs' true creditors, whose identity is still unknown.

80. Had Plaintiffs been aware that the Defendants were not the true creditor who funded their loan and to whom the debt was owed and that they were not secured creditors, Plaintiffs bankruptcy would have resulted in Plaintiffs' unsecured creditors being paid more through their bankruptcy.

81. Plaintiffs filed a Chapter 13 Bankruptcy in an attempt to save their home. Plaintiffs were unaware that no matter what they did they would not be able to save their home because these entities wanted nothing more than to foreclose upon the Plaintiffs rather than work out a modification with them.

82. Modifications for these entities is a risky business because it raises the stakes that the actual creditors, the investors who put up the money that the Plaintiffs borrowed, might be able to figure out that the loans generated by their investment was far less than the amount they actually invested.

83. The Defendants needed to foreclose, rather than modify Plaintiffs'loan, so that they can keep the illusion going and keep the Borrowers (Plaintiffs) and creditors (investors) from comparing notes.

84. Plaintiffs received an Order of Discharge from the Bankruptcy Court for the Middle District of Tennessee on or about July 2011.

85. On 9/7/12 Goldman Sachs Mortgage Company, through their agent Wilson, foreclosed upon Plaintiffs' right of redemption which foreclosure was wrongful.**(Ex.9).**

86. Plaintiffs did not receive written notice of default nor did they receive any written Notice of Trustee's Sale prior to the foreclosure of their property notifying them of the date, time and place of the foreclosure.

16

87.     The Affidavit of Publication recorded with the Rutherford County Registry of
Deeds office in Book 1159, Page 2108 indicates that the Notice of Foreclosure appeared
in the Daily News Journal on 6/11/2012; 6/18/2012; and 6/25/2012.

88.     The property address listed with the advertisement in said newspaper lists a
property located at 308 Cedar Street, Brownsville, Tennessee 38012 instead of Plaintiffs'
address of 3414 Westbrook Drive, Murfreesboro, TN 37130.**(Ex. 10).**

89.     On information and belief and therefore alleged, Plaintiffs never received the
required Notices which are to be sent prior to foreclosure because they were sent to 308
Cedar Street, Brownsville, Tennessee 38012 and not Plaintiffs' address of  3414
Westbrook Drive, Murfreesboro, TN 37130.

90.     By supplying the wrong address in the newspaper advertisement renders the
foreclosure void. The bidding process was tainted due to the wrong address being
provided. We will never know how many bidders may have shown up at the foreclosure
sale if the proper address had been provided. Therefore the foreclosure is void.

91.     The address listed on the Trustee's Deed also lists the incorrect address as 308
Cedar Street, Brownsville, Tennessee 38012 whereby the property in Trustee's Deed
does not adequately describe the foreclosed upon property rendering the foreclosure void.

92.     Plaintiffs allege that Wilson, acting ultra vires, sold their property at foreclosure,
upon a credit bid, to Goldman.

93.     Plaintiffs allege that Wilson, acted in consort with Ocwen and Goldman, to
unlawfully convert the Property from the Plaintiffs to their own through the actions
described above and the wrongful foreclosure.

94. Plaintiffs contend that all alleged Trustees under their Deeds of Trust had a fiduciary duty to maintain an interest to both the Borrower and the "Creditor", and had a duty to exercise due diligence to preserve the condition of title to the Plaintiffs' Property by making sure that all the recordations were proper and legal.

95. Plaintiffs further contend and allege that the Wilson, as alleged Trustee, is a necessary party because he is listed on a Successor Trustee document recorded with the Rutherford County Registry of Deeds and by being so named he was obligated by law to enforce the provisions of the Deed of Trust, including the Plaintiffs' right to convey the property, unencumbered, which the Plaintiffs now claim has been subverted and breached.

96. Plaintiff contends that Wilson was working in consort with the purview of Goldman and Plaintiffs contend and allege that Wilson had personal knowledge of all of the facts set forth herein and thus had a fiduciary duty to the Plaintiffs and the creditors to preserve the condition of title to the subject Property.

## STEP TRANSACTION DOCTRINE

96. The step transaction doctrine "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." *Penrod v. Commissioner*, 88 T.C. 1415, 1428 (1987).

97. The securitization process is a series of formally separate steps which are in substance integrated, interdependent, and focused toward a particular result and therefore should be aggregated into a single transaction.

98. Courts generally apply one of three alternative tests in deciding whether to invoke the step transaction doctrine and disregard a transaction's intervening steps. These tests,

18

in increasing degrees of permissiveness are: The binding commitment test, the end result test, and the interdependence test.

99.    The least permissive of the three tests, the binding commitment test, considers whether, at the time of taking the first step, there was a binding commitment to undertake the subsequent steps.

100.   Under the "binding commitment test", we look at whether there was a binding commitment to enter into a later agreement by looking at the agreements of the parties in "privity" and by the conduct of the parties and their obvious intent.

101.   The intent of Long Beach was to initiate the mortgage application knowing that the loan was either pre-sold, or would be sold on the application terms, or would be sold after the loan documents were signed.

102.   The very existence of "selling forward" presumes securitization and the existence of one or more investors at the other end of the chain, who probably were not told that they were buying loans that did not yet exist.

103.   Even where there was no "selling forward" the description of the loans was at variance with reality even though the intent to convey and pledge an interest in the mortgage and note is clear from the behavior of the parties to securitization.

104.   Dropping the underwriting and appraisal standards in order to satisfy the insatiable appetite of Wall Street for paper, regardless of how worthless it was, is a clear indication that there was a commitment intended to be fulfilled.

105.   Long Beach completely dropped its underwriting standard regarding the loans made to the Plaintiffs, which was allegedly secured by the subject Property. The appraisal of the property did not comply with normal underwriting standards.

19

Case 3:12-cv-01191   Document 1-1   Filed 11/16/12   Page 21 of 66 PageID #: 26

106. The fact that Plaintiffs' loan passed underwriting, considering the amount of work necessary to make the home habitable, is an indication that Long Beach engaged in the selling forward frenzy associated with securitized loans.

107. The behavior of Long Beach in creating that high risk loan and masquerading it otherwise surely indicates that Long Beach did not perceive itself at risk, thus implying a continuing transaction in the chain wherein a third party would receive the risk.

108. The "end result" test focuses on the parties' subjective intent at the time of structuring the transaction. See *True v. United States*, 190 F.3d 1165, 1175 (10th Cir. 1999) (holding that what matters is not whether the parties intended to avoid taxes but if they intended "to reach a particular result by structuring a series of transactions in a certain way").

109. The test examines whether the formally separate steps are prearranged components of a composite transaction intended from the outset to arrive at a specific end result.

110. We have no hesitation in concluding that under the "end result" test, we can safely invoke the step transaction doctrine regarding the loans made to the Plaintiffs. The investor put up the money and the borrower signed the documents.

111. Under the investor deal, it was backed by the Plaintiffs' signature(s) and under the loan documents, it was based on money that came from the investors.

112. The third and least rigorous of the tests is the interdependence test. This test analyses whether the intervening steps are so interdependent that the legal relations created by one step would have been fruitless without completion of the later series of steps. See *Penrod v. Commissioner*, 88 T.C. 1415, 1428-1430 (1987).

20

113. Under the interdependence test the argument is complete. There would be no reason for any of the actions of any of the parties in the securitization chain but for the investor purchasing securities with money that would be used for the loans nor would there be any loan without the money from the investor.

114. If the investor funds had not been the source of funding then Long Beach would not have lowered their underwriting and appraisal standards.

115. The three tests outlined above are not mutually exclusive. The requirements of all, and certainly of two of the three tests, have been met here. Moreover, a transaction need only satisfy one of the tests to allow for the step transaction doctrine to be invoked.

116. "Transactional creativity" employed by the clever bankers and wall street lawyers in structuring the mortgage transaction should not affect how the law views the substance of what truly occurred. Though the step transaction doctrine was historically used primarily in tax and bankruptcy courts, it is important for courts analyzing wrongful foreclosures where securitized mortgages are concerned, to utilize the doctrine in interpreting mortgage contracts regarding the obligations of the borrowers and to whom the obligations flow. The courts should look beyond the "technical formalities" in order to ensure the fulfillment of the parties' expectations.

117. All the transactions in the securitization process should be aggregated into a single transaction which would create only one possibility for a holder in due course out of all the "holders" in the chain - - the investor who actually put up the money that was used to fund the loan. Therefore, the foreclosure by Goldman was wrongful.

## FRAUDULENT SCHEME

118.  Long Beach posed and held itself out as a conventional residential mortgage
lender.

119.  Upon information and belief, Long Beach collected a fee for posing and holding
itself out as the residential mortgage lender.

120.  Despite the fact that Long Beach was named as the payee on the notes described
herein, Long Beach never was, in fact, the actual mortgage lender of Plaintiffs' loans.

121.  Long Beach was named the Lender and Beneficiary on the Deeds of Trust
described herein.

122.  In direct contradiction with the closing documents, Long Beach was neither the
source of funding, nor did it have any beneficial interest as "Lender", nor did it have any
beneficial interest as named "beneficiary".

123.  It was the Certificate Investors of an unnamed and unidentified Trust into which
Plaintiffs' loan was allegedly placed who were the actual lenders with beneficial interest
in the Plaintiffs' loan.

124.  These Certificate Investors do not constitute a financial institution and are not
otherwise chartered or registered to be lenders.

125.  Therefore, at the time of recording of Plaintiffs' deed of trust, the source of
funding and the "Lender" was a different entity than the nominal mortgagee or
beneficiary under the Deeds of Trust and was neither named nor disclosed in any fashion.
The alleged security for the "loan" thus allegedly secured an obligation that had been
paid in full by a third party.

126.  The Defendants have failed to provide any information to Plaintiffs regarding the
owner and/or holder of their note and deeds of trust.

22

127.    Upon information and belief, Long Beach acted, prior to the August 24, 2005 alleged closing, as the principal in its relationship with the "independent appraiser" of Plaintiffs' home.

128.    Upon information and belief, Long Beach induced the Plaintiff into the August 24, 2005 alleged closing that Long Beach knew or should have known could not meet any underwriting standards for a residential mortgage.

129.    The Plaintiff relied upon Long Beach's misrepresentation that it was a mortgage lender, leading them to believe that Long Beach had an interest in the success (repayment of the loan) of the transaction.

130.    Upon information and belief, Long Beach and their alleged successors had no financial stake (i.e. liability) in the transaction and no interest other than obtaining Plaintiffs' signature on the "loan".

131.    At all times material hereto, Long Beach knew that the real estate appraisal conducted in August 2005 was intentionally and knowingly inflated and overstated.

132.    Upon information and belief, Long Beach encouraged and requested the overstatement of the appraisal in order to justify the amount of the loan.

133.    Plaintiffs relied upon Long Beach's misrepresentation regarding the value of their home.

134.    Upon information and belief, no lender was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing.

23

135.    Insofar as Long Beach was not the beneficial "lender", it did not need to comply with any underwriting standards, rules, and regulations governing banking and other financial institutions that perform the function of "lender".

136.    Upon information and belief and therefore alleged, the inflated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Plaintiffs as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

137.    Upon information and belief and therefore alleged, Long Beach's handling of this mortgage loan transaction was solely to collect fees, rebates, kickbacks and profits.

138.    Upon information and belief and therefore alleged  one of the fees that Long Beach was paid was 2.5% or more of the face amount of the mortgage upon the submission of Plaintiffs' application for said mortgage loan.

139.    Upon information and belief and therefore alleged, the Defendants have created an elaborate labyrinth sometimes referred to as a "securitized trust" for the purpose of selling "mortgage-backed securities."

140.    Upon information and belief and therefore alleged, the Prospectus Supplement and Pooling and Servicing Agreement for the unknown securitized trusts contains warranties and representations by participants in the securitization process, under oath to the Securities and Exchange Commission ("SEC"), and under penalty of perjury, that the

24

loans worth over hundreds of millions of dollars consisting of homeowners' mortgage loans were to be placed into the trusts by way of a series of transfers detailed therein.

141.   Upon information and belief and therefore alleged, in the securitization process there are sworn documents presented to the SEC which set out very specific guidelines and safeguards necessary to place mortgage loans into securitized trusts.

142.   The mortgage loans and the assignments thereof are governed by the Pooling and Servicing Agreement, Prospectus Supplement and Purchase Agreements for trust into which mortgage loans are transferred.

143.   The purpose of making those representations was to ensure would-be investors in the trust their investments were secure.

144.   The trust entity is also known as a Special Purpose Vehicle ("SPV"). Said SPV issues securities collateralized by the mortgages under a Master Pooling and Servicing Agreement by which all legal and equitable interest was transferred to the certificate holders ("investors")

145.   Defendant Goldman had no right, title or interest in the subject property at the time they foreclosed.

146.   Defendant Goldman was not the holder, owner or proper transferee of the Notes nor was there a proper assignment of the Deeds of Trust assigning any interest in the subject property prior to or anytime after the foreclosure.

147.   Defendants have failed to disclose the actual creditor who is the true owner of Plaintiffs' notes.

148. Defendant Goldman caused a foreclosure action to proceed against Plaintiffs' property on September 5, 2012 without any right, title and/or interest in Plaintiffs' notes and/or Deeds of Trust.

149. Plaintiffs made numerous attempts with Ocwen, their alleged servicer, to modify their loans prior to foreclosure.

150. Ocwen did not respond to Plaintiff's request for modification, rather, Goldman foreclosed upon Plaintiffs' property when it knew, or should have known, that it had no right, title and/or interest in Plaintiff's loan.

151. Upon information and belief and therefore alleged, Defendant Goldman placed a "credit bid" at the foreclosure sale when it was neither the Lender nor creditor, the only parties allowed to place a credit bid. Therefore, there was no consideration at the time of foreclosure and the foreclosure is void.

## **FAILURE TO DISCLOSE THE TRUE LENDER**

152. At all times, Plaintiffs did not know the true identity of the Lender or the holder of the notes and deeds of trust. Ocwen was allegedly servicing the loan but the true Lender, the one who actually loaned the funds, and the true holder of the loans were never disclosed to Plaintiffs.

153. At no time whatsoever did Defendants Long Beach ever advise Plaintiff that:

a.          the originating "lender", that being Defendant Long Beach, had no intention of retaining ownership in the mortgage loan or fully servicing same and in fact may have already presold the loan, prior to closing, to a third party mortgage aggregator;

b.          the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-10), for the ultimate purpose of bundling the Plaintiffs' mortgages with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a Real Estate Mortgage Investment Conduit ("REMIC") security known as

26

a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm in order to end up as a collateral for an unnamed and unidentified trust;

c.          the mortgage instruments and Promissory Notes may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Notes may not be in privity with or have the legal right to foreclose in the event of default;

d.          in connection with the multiple downlink resale and assignment of the mortgages and Promissory Notes that assignees or purchasers of the Notes may make "pay downs" against the Notes which may effect the true amount owed by the Plaintiffs on the Notes.

### THE CONVOLUTED WORLD OF REMIC AND MORTGAGE BACKED SECURITIES.

154.    A REMIC is a tax exempt entity and therefore the Tax Code imposes strict requirements and limitations involved with its creation and operation.[1]

155.    The Internal Revenue Code requires that a REMIC adopt reasonable methods to prevent disqualified organizations from holding its residual interests. As such, a REMIC must contain assets that are bankruptcy-remote.[2]

156.    During the recent credit boom, the financial industry commonly bundled the rights to thousands of individual loans into a mortgage-backed security (MBS). These loans were then securitized into a Trust which qualified for REMIC status.

157.    In order to assure that the assets were bankruptcy removed, they were required to be sold and transferred multiple times before the Trust acquired them.

158.    The ordinary securitization process begins with the initial loan from the originating lender to the debtor. Here that is Long Beach the "originator". The loan is sold to the sponsor.  The loan is then sold again from the Sponsor to the Depositor,

---

[1] A REMIC is a real estate mortgage investment conduit, as defined under I.R.C. §§ 860A-860G
[2] Peaslee, James M. & David Z. Nirenberg. Federal Income Taxation of Securitization Transactions. Frank J. Fabozzi Associates (2001, with annual supplements, www.securitizationtax.com): 330.

27

Finally, the loan is sold from the Depositor to the Trust. The Trust then sold interests in the income from those mortgages to investors in the form of shares. The diagram below presents a graphical depiction of the securitization process.[3]



[3] Diagram taken from *Problems in Mortgage Servicing from Modification to Foreclosure,* Written Testimony of Adam J. Levitin Associate Professor of Law, Georgetown University Law Center before the Senate Committee on Banking, Housing, and Urban Affairs November 16, 2010.

28



159.    If the transfer were directly from the originator or sponsor to the trust, the loans

could possibly be claimed as part of the originator's or sponsor's bankruptcy estate and

therefore a violation of the REMIC requirements of the Tax Code.[4]

## THE PSA IS A VARIATION BY AGREEMENT OF THE UNIFORM

## COMMERCIAL CODE

160.    Because the REMIC status and avoidance of double taxation (trust level and

investor level) is so critical to the economics of securitization deals, the PSAs that govern

the securitization trusts are replete with instructions to servicers and trustees to protect

---

[4] REMICs are supposed to be passive entities. Accordingly, with few exceptions, a REMIC may not receive new assets after 90 days have passed since its creation, or there will be adverse tax consequences. Thus, if a transfer of a loan was not done correctly in the first place, proper transfer now could endanger the REMIC status. For an overview of residential mortgage-backed securities in general, see American Securitization Forum, ASF Securitization Institute: Residential Mortgage-Backed Securities (2006) (online at www.americansecuritization.com/uploadedFiles/RMSB%20Outline.pdf).

the REMIC status, including provisions requiring that the transfers of the mortgage loans occur within a limited time after the trust's creation (aka the Closing Date).[5]

161.    The Debtor therefore alleges that the PSA is a "variation by agreement" of the UCC § 1-302.[6] Consequently, the Trust has opted out of the waivable portions of UCC and therefore the Trust can ONLY become a holder or owner of the Note through the negotiation and delivery requirements of the PSA.

162.    It is usually Section 2.05 of the PSA, which dictates conveyance of the loan to the Trust, and requires that loans be deposited to the trust on the "closing date" or "cut-off date".

163.    The closing date for a trust is typically 90 days after the creation of the trust. Plaintiffs' loan is a 2005 loan and therefore any assignment into the trust would have been 2005.

164.    In the present case there is no assignment into the trust and the assignment which is an attempt to place Plaintiffs' loan into the trust is the assignment to Goldman Sachs

---

[5] See, e.g., Agreement Among Deutsche Alt-A Securities, Inc., Depositor, Wells Fargo Bank, National Association, Master Servicer and Securities Administrator, and HSBC Bank USA, National Association, Trustee, Pooling and Servicing Agreement (Sept. 1, 2006) (online at www.secinfo.com/d13f21.v1B7.d.htm#1stPage).

[6] § 1-302. Variation by agreement.

(a) Except as otherwise provided in subsection (b) or elsewhere in the Uniform Commercial Code, the effect of provisions of the Uniform Commercial Code may be varied by agreement.

(b) The obligations of good faith, diligence, reasonableness, and care prescribed by the Uniform Commercial Code may not be disclaimed by agreement. The parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable. Whenever the Uniform Commercial Code requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by agreement.

(c) The presence in certain provisions of the Uniform Commercial Code of the phrase "unless otherwise agreed", or words of similar import, does not imply that the effect of other provisions may not be varied by agreement under this section.

dated May 21, 2012 which would be outside of any cut-off date for the securitized trust that Plaintiffs' loan was sold into.

165.  The Mortgage file is typically defined as *Mortgage File*: The following are the typical mortgage documents pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to a typical PSA filed with the SEC:

(a)  the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of _____, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee or (in the case of not more than 1.00% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date) a copy of such original Mortgage Note with an accompanying Lost Note Affidavit executed by the Seller;

(b)  the original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM loan, with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(c)  unless the Mortgage Loan is registered on the MERS® System, an original Assignment in blank;

(d)  the original recorded Assignment or Assignments showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee or in

31

blank (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN) as contemplated by the immediately preceding clause (c);

(e)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(f)     as an original, photocopy or in electronic form, lender's title insurance policy, together with all endorsements or riders issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first or second lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

166.    A complete chain of indorsements, rather than a single indorsement in blank with the notes transferred thereafter as bearer paper, is important for establishing the "bankruptcy remoteness" of the trust assets, as required by the REMIC portions of the Tax Code.

167.    Without a complete chain of indorsements, it is difficult, if not impossible, to establish that the loans were in fact transferred from originator to sponsor to depositor to trust, rather than directly from originator or sponsor to the trust.

168.    The questions about what the transfers required, therefore, involve both the question as to whether the required transfers actually happened, as well as whether, if they happened, they were legally sufficient.

169.    If the Trust were to accept loans after the closing date (circa 2005), it would stand to forfeit the tax benefits that served as the underlying purpose for its creation.

170.    In the present case we have an assignment from WAMU as successor to Long Beach assigning Plaintiffs' loan to MTGLQ dated in 2008. This assignment is attempting to assign a void Deed of Trust and the assignment would be outside of any cutoff date for a 2005 trust into which Plaintiffs' allege their loan was sold.

171.    In the present case we have an assignment from MTGLQ to Goldman dated in 2012. This assignment is attempting to assign a void Deed of Trust and the assignment would be outside of any cutoff date for a 2005 trust into which Plaintiffs' allege their loan was sold.

172.    The assignment from MTGLQ to Goldman in 2012 would have been at a time when Defendants' allege Plaintiffs loan was in default. Even if Plaintiffs' loan were not sold to a securitized trust, if Goldman obtain Plaintiffs' loan at a time that it was in default then Goldman did not become a "holder-in-due course" or a proper transferee of Plaintiffs' loan and therefore could not foreclose upon Plaintiffs' right of redemption.

173.    Plaintiffs allege that their loan was sold to an unidentified securitized trust and therefore any assignment of their loan in 2012 attempting to assign their loan into the unidentified trust is of no force and effect because the unidentified trust would not be allowed to accept mortgages in default.

174.    Although Plaintiffs steadfastly hold that their loans were not, and are not, in default, Defendants have alleged that Plaintiffs loans were in default and therefore they could not be assigned to the unidentified trust as Defendants attempt to show by way of the assignment to Goldman.

### SECURITIZED TRUSTS ARE ESTABLISHED UNDER EITHER NEW YORK OR DELAWARE LAW WHICH REQUIRES ADHERENCE TO THE PSA

175. Under New York and/or Delaware Statutory Trust Act the law of the business trust is drafted into the Trust instrument.

176. .Under the New York and/or Delaware Act, a governing instrument is defined as any "trust instrument" (whether referred to as a trust agreement, declaratory trust or otherwise) which creates a statutory trust or provides for the governance" of its business and affairs.

177. The PSA is the contract that gives the Trustee and the Servicer any identity or capacity. The Trust is only a real party in interest pursuant to and in accordance with the PSA. Without the PSA, the Trustee and the Servicer are without identity or legal capacity.

179. Therefore, any act by the Trustee that does not comply with the PSA would be void according to the either New York or Delaware Statutory Trust Act. This would include acquiring a mortgage loan that did not comply with the conveyance requirements of the Trust.

## COUNT 1
## COMPLAINT TO QUIT TITLE

180. Plaintiffs reaffirm and re-allege paragraphs 1 through 179 herein as if specifically set forth more fully herein below.

181. For a relief of quiet title the complainant must show that he himself has the title, or else he has no right to have a cloud removed from that to which he has no title in himself. *Hoyal v. Bryson,* 53 Tenn. 139, 1871 WL 3829, at *1 (Tenn. 1871). To prove quiet title the party must have a legal title or actual possession of the property on which

34

there is an alleged dispute. *Grand Hotel, LP v. Cardin,* No. M2004-00996-COA-R3-CV., 2005 WL 2012778, at*5 (Tenn. Ct. App. Aug. 11, 2005). When neither the plaintiff nor the defendant has possession of the property and both are claiming the property for the title, the party with the better paper title will prevail. *Id.* Generally, a party needs to show that he holds legal title to the disputed property. *Id.*

182.    The Deeds of Trust and the assignments thereof are the documents that were used by the Defendants in order for them to claim rights in Plaintiffs' Property enabling them to foreclose upon Plaintiffs' Property.

183.    The Deeds of Trust, having been dated prior to title being transferred to Plaintiffs, are of no force and effect rending them void.

184.    The Note that the Deed of Trust allegedly secures is void ab initio and therefore the Deed of Trust is not a valid lien on Plaintiffs' Property.

185.    The Plaintiffs claim rights to superior title over all other claimants as set forth herein and contend and allege that the Defendant Goldman, or any other claimants that may claim to bear record have no legally-recorded interest giving it any right to exercise a Substitution of Trustee by and through any of its agents. Yet by an through Defendants joint actions, they substituted Wilson as its trustee to wrongfully foreclose on the Plaintiffs' Property, an action which Plaintiffs claim, because of lack of standing on the part of Goldman, renders the subsequent action of Wilson, as alleged Trustee, ultra vires, thus clouding the Plaintiffs' title to their property, rendering it uninsurable and thus unmarketable.

186.    Defendants must have had a financial interest in the mortgage note before they could assert rights under the Deed of Trust. Otherwise, Defendants encumbrance is void.

35

The authoritative cases hold that a financial interest in the underlying obligation is required before a party, or its surrogate, can assert rights under a Deed of Trust.

187.    Defendants have claimed an interest in the property that is adverse to Plaintiffs herein. However, the claim of title of Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in said property.

188.    Plaintiffs therefore seeks a declaration that the title to the subject property is vested in Plaintiffs alone and that the Defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Plaintiffs herein.

## COUNT II
## BREACH OF FIDUCIARY DUTY

189.    Plaintiffs reaffirm and re-allege paragraphs 1 through 188 herein as if specifically set forth more fully herein below.

190.    Plaintiffs contend and allege that the Trustee owes a duty to both the Creditor (Lender) and the Borrowers (Plaintiffs). The Defendant Goldman, in conjunction with unknown investors of the yet unidentified trust, substituted a Trustee (Wilson) that not only failed to exercise due diligence to determine ownership interests and condition of the Plaintiffs' title to their Property prior to foreclosing on it, but also failed to use due diligence in determining whether they had been properly appointed Trustee.

191.    Wilson further breached their fiduciary duty by accepting a credit bid from Goldman at the foreclosure sale of Plaintiffs' Property thereby negligently and unlawfully converting the Plaintiffs' Property to Goldman along with slandering the title to the Plaintiffs' Property.

36

192.    Because the interests of the undisclosed investors in the instance of the loan with

Long Beach, along with the unidentified trust, are unrecorded and remain so, the actions

of the Trustee I this cause were ultra vires, biased totally in favor of a claimed servicer,

Ocwen, and alleged party in interest Goldman and not the real party in interest.

193.    Wherefore, Plaintiffs request judgment and relief as stipulated herein.

### (as to Defendant Goldman)

194.    Plaintiffs reaffirm and re-allege paragraphs herein as specifically set forth more

fully herein below.

195.    By and through the actions of Wilson and Goldman, who the Plaintiffs contend

failed to demonstrate through proper documentation of their authority to act and their

interest in Plaintiffs' Property respectively, and have failed to maintain proper

notification as to who the real party in interest is, in Violation of T.C.A. § 47-23-106(a-

c), and have jointly breached Paragraph 23 of the Non-Uniform Covenants in the

Substitution of Trustee and Successor Trustee by a party who is not a lender of record or

otherwise whereby the first Appointment of Substitute Trustee is by Long Beach

Mortgage who was not Plaintiffs' lender and the second appointment of Successor

Trustee is by Goldman who claims on the recorded document to be merely the "holder of

said Deed of Trust).

196.    Goldman has provided no proof that it was indeed the real party in interest in the

Plaintiffs' loan, other than there self-serving assignment of the Deed of Trust signed by

Lynn Bluege-Rust, attorney-in-fact for MTGLQ Investors. Lynn Bluege-Rust is a V.P. of

Collateral for Goldman Sachs and therefore the Plaintiffs claim that the Trustee is a

necessary party due to the fact that Wilson breached its fiduciary duty by not requiring a

37

Power of Attorney granting Lynn Bluege-Rust the authority to sign on behalf of MTGLQ as their attorney-in-fact in order to ensure that Plaintiffs' Deed of Trust had been properly assigned to Goldman.

197. Goldman, who is not a bona fide lender cannot substitute the trustee to enforce the terms of the deed of trust. Richard Work, Contract Management Coordinator for Ocwen Loan Servicing, LLC signed the Appointment of Successor Trustee as Attorney-in-fact for Goldman appointing Wilson as Successor Trustee.

198. Wilson breached its fiduciary duty to Plaintiffs by not obtaining and recording the Power of Attorney granting Richard Work the authority to sign on behalf of Goldman on the appointment of Wilson as Successor Trustee in order to ensure that Wilson had been properly appointed Successor Trustee.

199. Wilson breached its fiduciary duty to Plaintiffs by accepting a credit bid at the foreclosure sale from Goldman when Goldman was not a bona fide lender. Wilson's acceptance of a credit bid from Goldman, who is not a bona fide lender, renders the foreclosure void for lack of consideration.

200. Wilson breached its fiduciary duty to Plaintiffs by intentionally foregoing a review of the documents necessary to ensure that the foreclosure complies with the terms of the deed of trust or negligently and by either negligently or intentionally failing to provide notice to the Plaintiffs of the foreclosure sale. The newspaper advertisement advertising the foreclosure sale had the wrong street address and Wilson, either intentionally or negligently sent the Notice of Foreclosure to the wrong address which had the effect of not giving the Plaintiffs notice of the sale.

38

201.   Wilson breached its fiduciary duty by either intentionally not reviewing Plaintiffs' title or negligently reviewing the title to Plaintiffs' property; failing to notice that the Deeds of Trust are dated prior to Plaintiffs obtaining title to the Property thereby leaving the Notes unsecured and not subject to foreclosure pursuant to said Deeds of Trust.

202.   The Plaintiffs challenge the rights and interests of the Long Beach and WAMU as successor to Long Beach in their Deeds of Trust with the rights of MTGLQ and Goldman as to the severability clause as referenced in Paragraph 17; the rights of a party not in interest to enforce the terms of sale under Paragraph 21 and the right of a party not in interest to Substitute a Trustee as stipulated in Paragraph 23 of the Deeds of Trust, as to their specific rights and duties and breaches thereto.

203.   Plaintiffs allege that the acts of Wilson aforementioned are intentional acts which intentional acts they were negligent in performing or are negligent acts which negligence stems from the business model Wilson has employed in their foreclosure practice.

204.   Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT III
## FRAUD IN THE INDUCEMENT

205.   Plaintiff reaffirms and re-alleges paragraphs 1-204 herein as if specifically set forth more fully herein below.

206.   Under Tennessee law, a Plaintiff must prove five elements to sustain a claim of fraud in the inducement of a contract: (1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the Statements falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under

39

circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance. *Blackburn & McCune, PLLC*, 2010 WL 2670816, at *11 (quoting Lamb, 26 S.W.3d at 630).

207.  Under Tennessee law, the fraudulent inducement of a contract invalidates the contract because there is no meeting of the minds and illusory consideration. *Seaton v. Lawson Chevrolet-Mazda, Inc.*, 821 S.W.2d 137 (Tenn.1991); *Dozier v. Hawthorne* Development Co., 37 Tenn. App. 279, 262 S.W.2d 705 (1953).

208.  Long Beach fraudulently induced Plaintiffs into entering into a loan where the actual terms were not disclosed to the Plaintiffs. MTGLQ and Goldman as alleged assignees are liable for the acts of their assignor.

209.  Long Beach, and therefore MTGLQ and Goldman through their alleged assignments, misrepresented to Plaintiffs the identity of the true Lender at the time of the loan closing.

210.  Because of the failure to identify the true lender at the time of closing Plaintiffs had been left trying to obtain a modification from an entity that did not have the authority to grant them a modification.

211.  Long Beach, and therefore MTGLQ and Goldman through alleged assignment, caused Plaintiffs to enter into a loan and pledge collateral by leading Plaintiffs into believing that Long Beach had just as much a stake in the loan that Plaintiffs had when in fact, Long Beach had no stake in the loan.

212.  Long Beach, and therefore MTGLQ and Goldman through alleged assignment, intended to induce reliance on their false statement on Plaintiffs' Note and Deeds of Trust that they were the Lender when in fact they did not fund the loan.

40

213.    Long Beach, and therefore MTGLQ and Goldman through assignment, caused an inflated appraisal of Plaintiffs' Property thereby placing Plaintiffs into a loan that whose principal was more than the real value of the house.

214.    Plaintiff has been injured by the actions of the Defendants. Wherefore, the Plaintiffs request judgment and relief as stipulated herein

## COUNT IV
## COMMON LAW FRAUD

215. Plaintiffs reaffirm and re-allege paragraphs 1-214 herein as if specifically set forth more fully herein below.

216.    Defendants, Ocwen and Goldman, knew or should have known that they were not secured creditors in Plaintiffs' Chapter 13 Bankruptcy.

217.    By listing themselves as creditors, secured or otherwise, in Plaintiffs' Chapter 13 Bankruptcy, Defendants Ocwen and Goldman defrauded Plaintiffs, Plaintiffs' other creditors and the Bankruptcy Court.

218.    Defendants Ocwen and Goldman received payments through Plaintiffs' Chapter 13 Bankruptcy as creditors, secured or otherwise, to which they were not entitled.

219.    Defendants Ocwen, MTGLQ, Goldman and Wilson intentionally prepared documents that contained false statements of material facts in their attempt to create the illusion that there was a complete and proper chain of title, that the substitution of trustee was properly appointed and that the foreclosure was conducted in accordance with the provisions of the Deeds of Trust.

220.    Defendants Ocwen, MTGLQ, Goldman and Wilson cause documents with false statements of material facts to be recorded with the Rutherford County Registry of Deeds.

41

221.     The fraudulent preparation and recording of documents were used in order to foreclose upon Plaintiffs Property.

222.     Plaintiffs have been injured by the actions of the Defendants. Wherefore, the Plaintiffs request judgment and relief as stipulated herein

## COUNT V
## NEGLIGENCE AS TO OCWEN, GOLDMAN AND WILSON

223.     Plaintiffs reaffirm and re-allege paragraphs 1-222 herein as if specifically set forth more fully herein below.

224.     Plaintiffs contend that the Defendants, Ocwen, Goldman and Wilson were negligent in their behavior to fully examine the land records to determine the condition of Plaintiffs' title prior to recording the substitution of trustee and other documents in Plaintiffs' chain of title.

225.     Ocwen and Goldman knew or should have known that Plaintiffs' loan was sold to a securitized trust contemporaneously with the origination of the loan and that they lacked standing and the capacity to foreclose.

226.     Ocwen, Goldman and Wilson were negligent in failing to examine all the documentation recorded at the Rutherford County Registry of Deeds prior to foreclosing on the Plaintiffs and if they had reviewed Plaintiffs' chain of title thoroughly they would have realized that the Deeds of Trusts did not create a valid lien on the property because they were dated prior to Plaintiffs obtaining title to the property. Plaintiffs could not grant a security interest in Property until they actually own the Property.

227.     Plaintiffs contend that Wilson was negligent in failing to examine all of the documentation involving the Plaintiffs' mortgage loan prior to foreclosing on their Property; negligent in failing to question the dates of the Deeds of Trust in relationship to

42

when the Plaintiffs actually took title to the property; negligent in failing to notice that the signatory on the appointment of Substitute Trustee from Long Beach to Priority Title Services of TN signed the document on June 29, 2006 and her signature was notarized on July 6, 2006; failed to obtain Power of Attorneys for signatories who signed as Attorneys-in-fact; negligent for claiming his right as a Trustee when he knew in fact that he was acting ultra vires in foreclosing and ultimately converting Plaintiffs' Property to that of Goldman; failing to notice that the street address in the newspaper advertisement was the incorrect street address; and accepting a credit bid from Goldman at the foreclosure sale without any documentation that led him to actually know whether in fact Goldman was the Lender and entitled to place a credit bid.

228.    Plaintiffs contend and allege that Defendants Ocwen, MTGLQ, Goldman and Wilson were negligent in their actions to foreclose on Plaintiffs' Property when they knew, or should have known, that the entire chain of title to Plaintiffs' Property was already compromised to the detriment of the Plaintiffs from the moment the Deed of Trust was recorded or from the moment the first Assignment and/or Substitute Trustee was recorded, before they jointly engaged in activities, including but not limited to manufacturing documents, robo-signing, false swearing, by failing to record properly authorized and notarized assignments and substitutions of trustee, and by failing to attach an affidavit showing power of attorneys for documents that were signed by signatories as attorneys in fact.

229.    Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT VI
## UNJUST ENRICHMENT

230. Plaintiffs reaffirm and re-allege paragraphs 1-230 herein as if specifically set forth more fully herein below.

231. Wrongful foreclosure actions and suits against banks have been widely publicized in the media, especially, claims against robo-signors who admitted they had no personal knowledge of what they were signing. This resulted in fraudulent documents being filed for record in county courthouses all over America. Plaintiffs contend and allege that they find it hard to believe that with all of the publicity surrounding these issues, as alleged investors, Defendants, Ocwen, MTGLQ, Goldman and Wilson failed to exercise due diligence with regard to the condition of title to a property they intended to foreclose upon, and thus they were negligent in doing so; they further participated in the wrongful foreclosure and unlawful conversion of property unto themselves.

232. Defendants Wilson and Goldman unjustly profited from the foreclosure of Plaintiffs' Property even though neither had any provable interest in it; Defendant Goldman knew that the Plaintiffs' loan, was part of a securitization process, which was sold and resold multiple times to multiple investors that were and are still unknown to the Plaintiffs; and that Goldman never actually loaned the Plaintiffs the sums in which it claimed to rely upon in the foreclosure action it commenced against the Plaintiffs and their Property. Further, the Plaintiffs contend and allege that the investors who actually bought the paper that Goldman claims to rely on have no recourse against Goldman for the Property that Goldman obtained, including any credit default swap insurance or mortgage insurance, through the foreclosure upon Plaintiffs' Property.

233. Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT VII
## FALSE AND DECPTIVE TRADE PRACTICES UNDER

## THE TENNESSEE CONSUMER PROTECTOIN ACT
## (AGAINST WILSON)

234.    Plaintiffs reaffirm and re-allege paragraphs 1-234 herein as if specifically set forth more fully herein below.

235.    By and through their actions, Defendant Wilson engaged in prohibited and unlawful, unfair and deceptive trade practices and/or services as defined by the Tennessee Consumer Protection Act (T.C.A. §§ 47-18-101 et seq) by engaging in acts and/or practices which were deceptive to the Plaintiffs as herein set forth.

236.    Wilson prepared and recorded with the Rutherford County Registry of Deeds an Appointment of Successor Trustee stating that he was being appointed by the "holder of said Deed of Trust, or acting with the authority of the holder of said Deed of Trust, when he knew or should have known that only the Lender can appoint a Substitute Trustee.

237.    Defendant Wilson foreclosed upon Plaintiffs' Property, claiming authority to do so pursuant to the Successor Trustee which he prepared with false material statements regarding his authority.

238.    The employment of the deceptive acts by Wilson was a willful and knowing violation of the Tennessee Consumer's Protection Act.

239.    Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT VIII
## FALSE AND DECEPTIVE TRADE PRACTICES UNDER THE
## TENNESSEE CONSUMER PROTECTION ACT
## (AGAINST GOLDMAN AND WILSON)

240.    Plaintiffs reaffirm and re-allege paragraphs 1-239 herein as if specifically set forth more fully herein below.

45

241. By and through their actions, Defendants Goldman, Wilson and their agents engaged in prohibited and unlawful unfair and deceptive trade practices and/or services as defined by the Tennessee Consumer Protection Act (T.C.A. §§ 47-18-101 et seq) by engaging in acts and/or practices which were deceptive to the Plaintiffs as herein set forth.

242. By its deceptive and unlawful acts and actions, Goldman, Wilson and their agents caused to be filed false, misleading and misrepresentative documentation in the office of the Rutherford County Registry of Deeds, subsequently slandering the Plaintiffs' chain of title, rendering it uninsurable which the Plaintiffs claim renders the marketable value of their property as zero. Due to the proximate actions of the Defendants herein, the Plaintiffs claim they have suffered the loss of the equity in their property, their investment as a whole and the right to peaceful and quiet enjoyment of their premises, damaged in an amount to be determined as to the current marketable value of the home had the title to their property been legally conveyable.

243. The employment of the deceptive acts by the Defendants was a willful and knowing violation of the Tennessee Consumer Protection Act.

244. Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT IX
## BREACH OF CONTRACT
## (AS TO DEFENDNAT GOLDMAN)

245. Plaintiffs reaffirm and re-allege paragraphs 1-244 herein as if specifically set forth more fully herein below.

246. By and through the actions of Defendants Goldman and Wilson, who the Plaintiffs contend and allege failed to demonstrate through proper recordation of their

46

interests or claims in the Plaintiffs' property, have failed to maintain proper notification as to who the real party in interest is, in violation of T.C.A. § 47-23-106(a-c), the Defendants have jointly breached Paragraph 23 of the Non-Uniform Covenants in the Substitution of Trustee by a party who is not the Lender.

247.    By and through the actions of Defendants Goldman and Wilson, who the Plaintiffs contend and allege have jointly breached Paragraph 21 of the Non-Uniform Covenants in the Deed of Trust by not providing the required notice, or any notice, to Plaintiffs informing Plaintiffs that they have a right to bring a court action to assert the non-existence of a default or any other defenses of Borrower to acceleration and sale.

248.    The Non-Uniform Covenants contained in Paragraphs 23 and 21 outlined above are prerequisites to foreclosure and a breach of said covenants renders the foreclosure void.

249.    Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT X
## SLANDER OF TITLE

250.    Plaintiffs reaffirm and re-allege paragraphs 1-250 herein as if specifically set forth more fully herein below.

251.    By and through the negligent actions of the Defendants jointly and severally, the Plaintiffs contend and allege that these Defendants' actions convoluted the entire chain of title, causing it to become irretrievably broken and thus uninsurable, unmarketable and worthless in the present state.

252.    The Plaintiffs maintain that even if they wanted to sell the property at fair market value, the condition of title is so badly distorted and clouded that a title company properly conducting business and understanding the issues regarding securitization of

47

mortgage loans, would never issue a homeowner's policy indemnifying them from future claims against defective title.

253. Wherefore, the Plaintiffs request judgment and relief as stipulated herein.

## COUNT XI
## INJUNCTIVE RELIEF

254. Plaintiffs reaffirm and re-allege paragraphs 1-253 herein as if specifically set forth more fully herein below.

255. Defendants and each of them have engaged in a course of conduct that has resulted in numerous clouds on the title to the Plaintiffs Property.

256. Plaintiffs are informed and believe, and on the basis of such information and belief allege, that their Property was taken from them through wrongful foreclosure by Defendants Goldman and Wilson, and others, at a great loss to the Plaintiffs, who expended thousands of dollars upgrading and rehabilitating the property for their own use and quiet enjoyment.

257. Plaintiffs have a clear and equitable and legal right in the subject property, as demonstrated by the facts set forth herein, they are entitled to the return of their property, with title solely in them, so that they may continue their equitable and legal rights and enjoyment of the Property.

258. If injunctive relief in the form of a restraining order and injunction does not issue, Plaintiffs will suffer actual and substantial injury of the loss of their property to a party or parties not entitled under any legal theory to any rights in the property.

259. The balance of interests is in the Plaintiffs' favor, as the Defendants herein provided no substantive proof of interest when they wrongfully foreclosed on the Plaintiffs' Property.

48

260.     Wherein the Plaintiffs' chain of title is affected there can be no summary

judgment against them, as "a petition which sets forth with sufficient clearness the facts

constituting the cause of action, which facts, if true, would entitle Plaintiff to relief, is

sufficient to state a cause of action…" *Titus v. Tolle*, 223 SW 885 (1920).

261.     Therefore, the Plaintiffs request that:

     (a)     the foreclosure sale be vacated;

     (b)     the title to the Property be restored in their name and that the Defendants

be immediately enjoined from attempting to transfer and sell the alleged note to any

third-party creditor for the purpose of pursuing debt collection activities against the

Plaintiffs.

262.     Plaintiffs also seek injunctive relief in the form of a restraining order restraining

Defendants from evicting Plaintiffs from their home.

**Wherefore, the Plaintiffs demand judgment against the Defendants, and each of them, for the following:**

**With Respect to Plaintiffs' First Cause of Action for Quiet Title:**

A. For an order quieting title in the subject property in the name of Plaintiffs Kevin McCord and Tracy McCord.

**With Respect to Plaintiffs' Second Cause of Action for Breach of Fiduciary Duty:**

B. To award the Plaintiffs exemplary and punitive damages in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid.

**With Respect to Plaintiffs' Third Cause of Action for Fraud in the Inducement:**

C. For an Order requiring the Defendants to return all monies paid under the loan and to declare the loan void ab initio. To award the Plaintiffs actual, compensatory, exemplary, special and/or punitive damages in an amount to be determined at trial, with interest on such award according to law from the judgment date until paid.

**With Respect to Plaintiffs' Fourth Cause of Action for Common Law Fraud:**

D. To award the Plaintiffs exemplary and punitive damages in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid. For an Order granting Plaintiffs rescission of their loan.

**With Respect to Plaintiffs' Fifth Cause of Action for Negligence:**
E. To award the Plaintiffs compensatory, exemplary and punitive damages against each Defendant in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid.

**With Respect to Plaintiffs' Sixth Cause of Action for Unjust Enrichment:**
F. To award the Plaintiffs compensatory, exemplary and punitive damages against each Defendant in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid.

**With Respect to Plaintiffs' Seventh Cause of Action for Violation of T.C.A. §§ 47-18-101 et seq:**
G. To award the Plaintiffs all statutory damages allowed by law.

**With Respect to Plaintiffs' Eighth Cause of Action for Violation of T.C.A. §§ 47-18-101 et seq:**
H. To award the Plaintiffs all statutory damages allowed by law.

**With Respect to Plaintiffs' Ninth Cause of Action for Breach of Contract:**
I. To void the contractual obligations of the Plaintiffs from the public record; and
J. To award the Plaintiffs compensatory, exemplary and punitive damages in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid.

**With Respect to Plaintiffs' Tenth Cause of Action for Slander of Title:**
K. To award the Plaintiffs exemplary and punitive damages against each Defendant in an amount to be determined at trial, with interest on such damages awarded according to law from the date of judgment until paid.

**With Respect to Plaintiffs' Eleventh Cause of Action for Injunctive Relief:**
L. To vacate and set aside the foreclosure action and sale of the Plaintiffs' Property.
M. To permanently injunct all defendants, restraining them from taking any action in the future inconsistent with the Plaintiffs' ownership rights in the property; including but not limited to permanently restraining said defendants from selling and disposing of the Plaintiffs' property at any Trustee's Sale now or at any time in the future.
N. To restrain the Defendants from evicting Plaintiffs through the pendency of this action.

**With Respect to All Causes of Action:**
O. Attorney's Fees
P. Legal Interest

Q. Costs of Suit; and
R. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Carol A. Molloy, BPR#024915
6724 Buford Station Road
Lynnville, TN 38472
(931) 527-3603 Phone
(931) 527-0382 Fax

State of Tennessee, Rutherford County
The undersigned, Circuit Court Clerk of
the said County and State, hereby certifies
that the foregoing is a correct copy of
the instrument filed in the foregoing case
in the Circuit Court of Murfreesboro, Tennessee.
This __12__ day of __Oct.__ __2012__
                    Laura Bohling Clerk

                                Deputy Clerk

51

# EXHIBIT 1

When recorded, mail to:

~~LONG BEACH MORTGAGE COMPANY~~
~~P.O. BOX 201085~~
~~STOCKTON, CA 95202~~
LOAN NO.   6556263-7762

*N TS*
*8115 Isabella Ln*
*Ste 5*
*Brentwood, TN 37027*

Record Book
553 Pg 1194

This Instrument Was Prepared By:   JUSTIN JAMISON
LONG BEACH MORTGAGE COMPANY
1400 S. DOUGLASS RD., SUITE 100
ANAHEIM, CA 92806

Maximum principal indebtedness for Tennessee recording tax purposes is $      143,792.00

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on      August      24 ,   2005      . The grantor is

KEVIN MCCORD and TRACY MCCORD, HUSBAND AND WIFE AS JOINT TENANTS

("Borrower"). The trustee is          WESLEY D. TURNER, whose residence is in:
WILLIAMSON COUNTY, TENNESSEE

("Trustee"). The beneficiary is      LONG BEACH MORTGAGE COMPANY

which is organized and existing under the laws of the State of Delaware                                           , and whose
address is      1400 S. DOUGLASS RD., SUITE 100, ANAHEIM, CA 92806
("Lender"). Borrower owes Lender the principal sum of
One Hundred Forty Three Thousand Seven Hundred Ninety Two and no/100--------------------------------
Dollars (U.S. $   143,792.00         ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides
for   monthly   payments,   with   the   full   debt,   if   not   paid   earlier,   due   and   payable   on
September  1 , 2045               . This Security Instrument secures to Lender: (a) the repayment of the debt
evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of
all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c)
the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this

TENNESSEE-Single Family-FNMA/FHLMC
UNIFORM INSTRUMENT   Form 3043 9/90
Amended 5/91
-6R(TN) (9703)
Page 1 of 7                    Initials:
VMP MORTGAGE FORMS · (800)521-7291
TDTN1 (04/12/05) PC

Case 3:12-cv-01191   Document 1-1   Filed 11/16/12   Page 55 of 66 PageID #: 60

purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in    RUTHERFORD    County, Tennessee:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

which has the address of    3414 WESTBROOK DR, MURFREESBORO
                                        [Street, City], Tennessee    37130    [Zip Code] ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Initials: _____

Form 3043    9/90

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed

to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any

demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14

Initials _____ Form 3043 9/90

-6R(TN) (9703)
TDYN5 (04/12/05) PC

Loan No. 6556263-7762

above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by applicable law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in paragraph 14. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower.

23. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

24. Waivers. Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property.

Initials Form 3043 9/80

-6R(TN) (9703)
TDTN8 (04/12/05) PC

Loan No. 6556263-7762

25. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

[X] Adjustable Rate Rider      ☐ Condominium Rider      ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ Balloon Rider      ☐ Rate Improvement Rider      ☐ Second Home Rider
☐ VA Rider      ☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____    _____(Seal)
                                         KEVIN MCCORD          -Borrower

                                          _____(Seal)
_____      TRACY MCCORD          -Borrower

_____(Seal)      _____(Seal)
                      -Borrower                               -Borrower

STATE OF TENNESSEE, _____ County ss:

On this _____ day of _____, 2005 , before me personally appeared
Kevin McCord + Teacy McCord

to me known to be the person(s) described in and who executed the foregoing instrument, and who acknowledged the execution of the same to be _____ free act and deed. Witness my hand and official seal.

My Commission Expires: _____

                                  Notary Public _____

NOTARY PUBLIC AT LARGE

-6R(TN) (9703)             Page 7 of 7                            Form 3043 9/90

My Commission Expires SEPT. 30, 2008

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made on this    24th    day of    August    ,
2005    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to :

## LONG BEACH MORTGAGE COMPANY

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

### 3414 WESTBROOK DR
### MURFREESBORO, TN 37130

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN THE BORROWER'S FIXED INTEREST RATE AND TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of    7.450    %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 1. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (a) Change Dates

The initial fixed interest rate will change to an adjustable interest rate on the first day of    September    ,
2007    , and on the first day of the month every 6th month thereafter. Each date on which the adjustable interest rate could change is called a "Change Date."

### (b) The Index

Beginning with the first Change Date, the interest rate will be based on an Index. The "Index" is the average of the London interbank offered rates for six month dollar deposits in the London market based on quotations at five major banks ("LIBOR"), as set forth in the "Money Rates" section of *The Wall Street Journal*, or if the Money Rates section ceases to be published or becomes unavailable for any reason, then as set forth in a comparable publication selected by the Lender. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

### (c) Calculation of Changes

Before each Change Date, the Lender will calculate my new interest rate by adding    Four and Ninety Nine Hundredths    percentage point(s) (    4.990    %) to the Current Index. The Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 1(d) on the following page, this rounded amount will be the new interest rate until the next Change Date.

Fixed/Adjustable Rate Rider - Libor

1956016 (9510)    ELECTRONIC LASER FORMS, INC. - (800)327-0545

19560161 (05/03/04) PC    Loan No. 6556263-7762

The Lender will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance as of the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments. The result of this calculation will be the new monthly payment.

(d) Limits on Interest Rate Changes

The interest rate at the first Change Date will not be greater than **9.450** % or less than **7.450** %. Thereafter, the adjustable interest rate will never be increased or decreased on any single Change Date by more than **One** percentage points ( **1.000** %) from the rate of interest applicable during the preceding 6 months. The adjustable interest rate will never be greater than **13.450** %, which is called the "Maximum Rate" or less than **7.450** % which is called the "Minimum Rate".

(e) Effective Date of Changes

Each new adjustable interest rate will become effective on each Change Date. The amount of each new monthly payment will be due and payable on the first monthly payment date after the Change Date until the amount of the monthly payment changes again.

(f) Notice of Changes

The Lender will deliver or mail a notice of any changes in the adjustable interest rate and the amount of the new monthly payment to the Borrower before the effective date of any change. The notice will include information required by law to be given to the Borrower and also the title and telephone number of a person who will answer any questions regarding the notice.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 17 of the Security Instrument provides as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 17 of the Security Instrument contained in Section B(1) above shall then cease to be in effect, and Uniform Covenant 17 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if

Fixed/Adjustable Rate Rider - Libor

-1956016 (9510)

Page 2 of 3

19560162 (05/03/04) PC

Loan No. 6556263-7762

exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
KEVIN MCCORD       -Borrower

_____ (Seal)
TRACY MCCORD       -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

[Sign Original Only]

# EXHIBIT 2

## EXHIBIT A

Being Lot 20, DOVE MEADOWS, PHASE 1, as shown on plat of record in Plat Book 23, page 104, in the Register's Office, Rutherford County, Tennessee, to which plat reference is hereby made for a more particular description of said property.

Being the same property conveyed to Kevin McCord and wife, Tracy McCord by Special Warranty Deed from Wells Fargo Bank Minnesota, N.A., as Trustee for Registered Holders of Option One Mortgage Loan Trust 2001-D, Asset-Backed Certificates, Series 2001-D, without recourse, of record in Record Book __553__, page __1192__, Register's Office for Rutherford County, Tennessee.

```
            Jennifer M Gerhart, Register
             Rutherford County Tennessee
Rec #: 448394      Instrument 1374731
Rec'd:    55.00       MBk: 81 Pg 945
State:   163.07
Clerk:     1.00          Recorded
EDP:       2.00  10/12/2005 at 9:00 am
Total:   221.07      in Record Book
                    553 Pages 1194-1204
```